**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PURE WAFER INCORPORATED, a
Delaware corporation, successor in
interest to Exsil, Inc., a Delaware
corporation,
        *Plaintiff-counter-defendant-*
*Appellee*,

        v.

PRESCOTT, CITY OF, an Arizona
municipal corporation; MARLIN
KUYKENDALL; CRAIG MCCONNELL;
ALAN CARLOW, in his capacity as a
Member of the Prescott City
Council; JIM LAMERSON, in his
capacity as a Member of the
Prescott City Council; STEVE BLAIR,
in his capacity as a Member of the
Prescott City Council; CHARLIE
ARNOLD, in his capacity as a
Member of the Prescott City
Council; CHRIS KUKNYO, in his
capacity as a Member of the
Prescott City Council; LEN
SCAMARDO, in his capacity as a
Member of the Prescott City
Council; MARK NIETUPSKI, in his
capacity as Public Works Director
of the City of Prescott; JOEL

No. 14-15940

D.C. No.
3:13-cv-08236-
JAT

OPINION

BERMAN, in his capacity as Utilities
Manager of the City of Prescott,
         *Defendants-counter-claimants-*
                        *Appellants.*

Appeal from the United States District Court
for the District of Arizona
James A. Teilborg, Senior District Judge, Presiding

Argued and Submitted April 14, 2016
San Francisco, California

Filed January 10, 2017

Before: Diarmuid F. O'Scannlain, Richard R. Clifton,
and N. Randy Smith, Circuit Judges.

Opinion by Judge O'Scannlain;
Partial Concurrence and Partial Dissent by
Judge N.R. Smith

# SUMMARY[*]

## Contract Clause

The panel affirmed in part and reversed in part the district court's permanent injunction in favor of plaintiff, entered following a bench trial, and remanded in an action brought under 42 U.S.C. § 1983 alleging that the City of Prescott, Arizona violated the Contract Clause of the Constitution when it declared that its sewage treatment plant would no longer accept wastewater discharged by plaintiff's metal refinishing plant.

This controversy centered on the fluoride concentration in plaintiff's effluent, and the City's enactment of an Ordinance imposing limits on such concentration. Plaintiff alleged that application of the Ordinance to plaintiff's industrial wastewater discharges constituted an unconstitutional impairment of its contract rights, in violation of the Contract Clauses of the federal and state constitutions.

Reversing the district court's judgment on the Contract Clause claims, the panel held that the City had not impaired the obligation of its contract with plaintiff, because the Ordinance has not altered the ordinary state-law remedies to which plaintiff would otherwise be entitled if it successfully proved a breach of contract. The panel stated that the City might very well have breached its contract, but that did not necessarily mean it has violated the Contract Clauses of the federal and state constitutions.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The panel held that the judgment for plaintiff could be sustained on the alternative ground that the City breached its contract with plaintiff. The panel held that the City had previously agreed to accept such effluent as the parties knew plaintiff would need to discharge in order to maintain a viable business and that the City agreed to bear the financial risk that state-initiated regulatory changes would make complying with such promise more costly than it was when the parties entered into an agreement. The panel held that enforcing the Ordinance against plaintiff would eviscerate the benefit of plaintiff's bargain; the City could not do so without putting itself in breach of the agreement. The panel stated that on remand the district court should decide the appropriate remedy. The panel further ordered that the district court's injunction forbidding enforcement of the Ordinance against plaintiff would remain in effect during subsequent stages of litigation.

Concurring in part and dissenting in part, Judge N.R. Smith concurred with the majority's conclusion that plaintiff did not have a claim under the Contract Clause of the United States or Arizona constitutions. Judge Smith dissented from the majority's sua sponte decision to reach plaintiff's alternative claims that the City breached its agreement. Judge Smith stated that the circumstances warranted remand to permit the district court (or an Arizona court) the first opportunity to address the merits of the breach of contract claim.

**COUNSEL**

Robert A. Shull (argued), Andrew L. Pringle, Kenneth A. Hodson, and Nicole F. Bergstrom, Dickinson Wright PLLC, Phoenix, Arizona, for Defendants-Counter-Claimants-Appellants.

Jeffrey D. Gross (argued), Scottsdale, Arizona; K. Layne Morrill and Stephanie L. Samuelson, Morrill & Aronson PLC, Phoenix, Arizona; for Plaintiff-Counter-Defendant-Appellee.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the City of Prescott, Arizona violated the Contract Clause of the Constitution when it declared that its sewage treatment plant would no longer accept wastewater discharged by one of its customers, a large metal refinishing plant.

I

This dispute sees the City of Prescott at odds with Pure Wafer, Inc., a corporate resident of Prescott, over contract interpretation. Pure Wafer's grievances run from the constitutional—the City has violated our nation's fundamental charter—to the mundane—the City has betrayed specific promises the two made to each other during happier days.

A

Pure Wafer runs a facility in Prescott for cleaning silicon wafers used by clients like IBM, Intel, and Motorola.  Called "test and monitor wafers," they play a crucial role in the production processes those companies employ to build microprocessors and computer chips.  Pure Wafer performs what is called a "reclaim" service: its role is to remove oxide nitrites from the wafers after they pass through a given phase of the production process, clean them, polish them, and send them back to its clients so they can be reused later on.  The wafers range in diameter from four inches to one foot.

Pure Wafer does a large volume of business, running the 36,000-square-foot Prescott facility twenty-four hours a day, seven days a week, at around ninety-five percent capacity.  All that reclamation activity generates a lot of wastewater—up to 195,000 gallons per day, although in practice it has been less—which Pure Wafer then discharges into the City's sewer lines.  The sewer lines carry Pure Wafer's effluent into the City's Airport Water Reclamation Facility ("AWRF"), one of three City-owned wastewater treatment plants in Prescott that process and treat effluent from the City's sewers.  The AWRF then discharges treated effluent either to golf courses or into recharge basins to replenish the City's aquifer.

This controversy centers on the fluoride concentration in Pure Wafer's effluent, and the City's recent enactment of an Ordinance imposing limits on such concentration.

B

In 1997 the City entered into a contract, called the Development Agreement ("the Agreement"), with Pure Wafer's predecessor in interest, a company called Exsil. In 2007 Pure Wafer purchased Exsil and acquired all of its rights and obligations under the Agreement. Like the parties, we refer to both entities as "Pure Wafer" for simplicity's sake.

At the time of the Agreement, Pure Wafer owned plants in Sulphur, Oklahoma and San Jose, California. The Agreement was a way for the City to entice Pure Wafer to build its third facility in the Prescott Airpark, which the City expected would create jobs, stimulate economic activity, spur infrastructure improvements, and generate tax revenue. In exchange, the City agreed to provide Pure Wafer with the sewage infrastructure it needed to conduct its reclamation business, plus (among other things) tax and zoning breaks to make it easier for Pure Wafer to expand the facility if it so desired. Pure Wafer constructed the facility in 1997, and expanded it in 2002, at a total cost of roughly $35 million.

C

Three provisions of the Agreement have figured centrally in the parties' arguments during the course of this litigation.

First, the Agreement's section 4.2, together with Exhibit F, provide that the City may not raise Pure Wafer's "sewer usage fees" above a certain rate schedule, so long as the fluoride content in Pure Wafer's effluent remains at or below 100 mg/L. Exhibit F recites that Pure Wafer's fluoride content has a "typical" value of 50 mg/L and a "maximum" of 100 mg/L. In addition, Section 4.2 obligates the City to

provide up to 195,000 gallons of "sewer capacity" per day, and to bear the cost of "augment[ing] such facilities" as necessary to "accept or accommodate" Pure Wafer's effluent.

Second, section 9.1 provides that Pure Wafer "will operate the Facility . . . in accordance with all local, state, and federal environmental regulations."

Third, section 14.7, an integration clause, states that "[t]his Agreement and the exhibits hereto constitute the entire agreement between the parties," "supersed[ing]" "all prior and contemporaneous agreements, representations, negotiations and understandings."

### D

Pure Wafer insists that when it negotiated the Agreement with the City, its most important objective was to make sure that its ability to operate the facility would not be thwarted by future changes in City regulations. As Pure Wafer tells it, it "didn't want to . . . build a plant that could be . . . rendered useless at any time by the City," and so it took precautions "to make sure that it had a locked up contract and a position on water, sewer and effluent requirements." To that end, Pure Wafer claims that it "made sure that the City was fully aware of what [the facility's] requirements were."

In particular, Pure Wafer avers that it was anxious to safeguard its ability to discharge effluent containing up to 100 mg/L of fluoride, and Pure Wafer maintains that the City represented that discharging fluoride up to that level "would be acceptable." In fact, earlier in the negotiations Pure Wafer had informed the City that its fluoride levels sometimes ran as high as 150 mg/L, but at the City's request, Pure Wafer

agreed to design the Prescott facility so that its fluoride contents would not exceed 100 mg/L, a commitment reflected in the maximum fluoride value listed in the Agreement's Exhibit F. In all the years it has run the Prescott facility, Pure Wafer's discharges have never exceeded 100 mg/L in fluoride concentration, and have averaged about 40 mg/L.

Pure Wafer's representatives testified that the company's concern over the prospect of fluoride regulation stemmed in part from its experience in San Jose, where it ran a reclamation facility prior to opening the one in Prescott. In the 1980s San Jose apparently passed an ordinance "similar" to the Prescott Ordinance at issue in this case, which required Pure Wafer to "put a lot of infrastructure in to deal with fluorides," the cost of which prevented Pure Wafer from expanding the facility. The real problem, Pure Wafer explains, was that it had no Development Agreement with San Jose; so much the wiser, Pure Wafer continues, it took steps to "communicate[] [its] needs to the City of Prescott and . . . actually got it inputted into a Development Agreement, the contractual obligation."

For its part, the City also claims that it harbored concerns about effluent composition in general and fluoride levels in particular. As noted above, the City had balked at Pure Wafer's initial report that its fluoride levels were sometimes as high as 150 mg/L. In addition, at public hearings prior to the Agreement's adoption, City officials stated that Pure Wafer would be required to comply with City codes regarding pretreatment of effluent discharge. At that same meeting, a Pure Wafer representative reassured the public that the company "did not want to pollute the air, water and ground, [and] that a system would be designed that would

allow discharge from their plant to be pure enough to go into
the city's wastewater treatment plant."

E

Subsequent changes in state and federal environmental
regulations set off the chain of events leading to this
litigation. Above all, in 1999 the Arizona Department of
Environmental Quality ("ADEQ")—the State's
environmental regulatory agency—required the City to obtain
an Aquifer Protection Permit ("APP"), which, in turn,
imposed a host of requirements on the City, including the
requirement that any discharge exiting the City's AWRF
could no longer exceed 4.0 mg/L of fluoride, measured at the
point of discharge from the AWRF.

That was a big change. Prior to the ADEQ-imposed APP
regime, the City operated the AWRF pursuant to a
Groundwater Protection Permit, which only required the City
to sample the groundwater monitoring wells in the recharge
basins in the City's aquifer, one or more steps downstream
from the AWRF's point of discharge. Under the
Groundwater Protection Permit, the fluoride concentration in
the recharge basins could not exceed 4.0 mg/L. The
important point is that the impact of Pure Wafer's effluent on
samples taken from the recharge basins is less pronounced
than it is with respect to samples taken at the AWRF, for at
least two reasons. First, the recharge basins take in effluent
discharged from at least two different sources: not only from
the AWRF, but also from the larger Sundog Wastewater
Treatment Plant. The AWRF's effluent has a higher fluoride
concentration than Sun Dog's, but the two streams of effluent
are commingled in the recharge basins, diluting the relative
importance of the AWRF's fluoride levels. Second, some

effluent leaving the AWRF is used to water golf courses and does not actually enter the recharge basins. Illustrating the combined importance of these circumstances, it appears that Pure Wafer's effluent has basically had no effect on the fluoride concentration in the aquifer, as from 1997 through 2013, the monitoring well readings consistently reported fluoride concentrations of less than 0.4 mg/L, or one tenth of the amount allowed under the Groundwater Protection Permit.

ADEQ's decision to shift the monitoring location to the AWRF's point of discharge had serious consequences. In particular, the City represents that the AWRF, "like most publically owned treatment works, is not designed to remove fluoride and other types of industrial pollutants" from the wastewater that flows into it, and that, in turn, it sends along to the aquifer. The upshot is that, in order for the City to comply with the APP's 4.0 mg/L fluoride limit at the AWRF's point of discharge, one of two changes had to occur: either the AWRF must be equipped to remove fluoride from wastewater that enters it; or the fluoride content of wastewater must be reduced before it ever enters the AWRF. The latter option is known as "pretreatment."

F

In 2004 ADEQ sent the City a Notice of Violation alleging seven dates during the previous year on which the AWRF's fluoride levels exceeded the maximum allowed under the City's APP. The Notice directed the City to "submit a written response describing the corrective actions that have been taken to resolve the violations." In response, the City in 2005 began to develop a pretreatment program and

to explore what local fluoride limits would help ensure that the City complied with its APP.

Nevertheless, when ADEQ conducted a "pretreatment compliance audit" of the City in 2007, it concluded that "[t]he City does not have valid control mechanisms in place to regulate the discharges" from the City's two categorical industrial users, including Pure Wafer. ADEQ declared it "imperative" that the City "establish an approved pretreatment program." Under state law, the City's APP violations could result in ADEQ fining the City up to $25,000 per day. A.R.S. § 49-262(C).

In 2012 ADEQ issued another Notice of Violation to the City, which still had not established a pretreatment program. The basis of the violation was again excessive fluoride concentration in effluent discharged from the AWRF. This time the City and ADEQ entered into a Consent Order, which mandated that within thirty days the City "shall adopt and submit for ADEQ's review and approval the Pre-Treatment Program."

## G

In due course, the City passed Ordinance No. 4856-1313 in 2013.[1] As relevant here, the Ordinance imposes limits on the pollutants that industrial users, like Pure Wafer, are permitted to discharge into the City's sewer system. Most important for this case, the Ordinance declares that Significant Industrial Users (of which Pure Wafer is one)

---

[1] Pure Wafer has not questioned the City's authority to enact the Ordinance. The City relies on a state statute, *see* Ariz. Rev. Stat. § 49-391, as well as Article I, Section 3 of its own Charter.

"shall not discharge or cause to be discharged at any entry point" to a publically owned treatment works, including the AWRF, "any wastewater containing in excess of" 16.3 mg/L of fluoride.[2] The Ordinance also requires industrial users like Pure Wafer to get a permit from the City and, to the extent necessary, to "pretreat" their wastewater prior to discharge—that is, to ensure, at their own expense, that their wastewater complies with the 16.3 mg/L limit on fluoride concentration. The Ordinance threatens those who violate it with injunctive action, civil penalties, and criminal prosecution. ADEQ approved the City's pretreatment program as established by the Ordinance.

The City estimates that if it were required to pretreat wastewater entering the AWRF so that it complies with the APP's fluoride limitations, it would cost the City $2.7 million in capital outlay and $8.5 million annually. Pure Wafer has not yet conducted a study, but its preliminary estimate suggested that pretreatment of its own effluent would require the company to spend $1 million to $4 million in capital outlay and $360,000 to $720,000 annually.

H

Not surprisingly, Pure Wafer was not pleased with such developments. Claiming that it will likely close the facility if forced to comply with the Ordinance, Pure Wafer brought this lawsuit against the City (and certain of its officers in their official capacities) under 42 U.S.C. § 1983, seeking declaratory and injunctive relief, or in the alternative,

---

[2] It appears that there were or are at least six Significant Industrial Users in Prescott, including Pure Wafer. Each received an identical letter from the City directing them to comply with the Ordinance.

damages. Pure Wafer alleged that by enacting the Ordinance the City had "impair[ed] the obligation" of its contract with Pure Wafer, in violation of Article I, section 10 of the federal Constitution, as well as the analogous Contract Clause of the Arizona Constitution; and that the City, by enacting the Ordinance, had committed at least two different breaches of contract, as well as a breach of the implied covenant of good faith and fair dealing. The City counterclaimed for a declaratory judgment that the Agreement in fact obligated Pure Wafer to comply with the Ordinance.

1

The district court held a hearing on Pure Wafer's motion for a preliminary injunction, which by consent of the parties the court converted into a trial on the merits, to be bifurcated into a liability phase and a damages phase. The parties also agreed that the City would not enforce the Ordinance against Pure Wafer during the pendency of this litigation, including any appeal.

2

After trial on the merits, the district court entered judgment for Pure Wafer, refusing to accept the City's contention that the pretreatment ordinance is an environmental regulation of the sort Pure Wafer agreed to obey. Instead, believing the Ordinance to be a thinly veiled "cost-shifting regulation," the district court held that the City, through the Ordinance, had impaired the obligation of its contract with Pure Wafer, in violation of the Contract Clauses

of the federal and state constitutions.[3]  The district court awarded Pure Wafer a permanent injunction.  The court declined to rule on Pure Wafer's alternative claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and deemed it unnecessary to proceed to the damages phase of the trial.  In addition, the district court held that Pure Wafer was entitled to attorneys' fees, but did not set an amount until several months later.  The court denied the City's counterclaim.

3

The City timely appealed the district court's judgment. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367,[4] and we have jurisdiction under 28 U.S.C. § 1291.

II

The City first argues that the district court erred in holding that the City, by enacting the Ordinance, had violated the Contract Clause.  The Contract Clause of the Constitution declares that "No State shall . . . pass any . . . Law impairing the Obligation of Contracts."  U.S. Const. art. I, § 10, cl. 1.

---

[3] The district court and both parties treat the Contract Clause of the Arizona Constitution, Ariz. Const. art. II, § 25, as identical in scope to its federal counterpart.  Accordingly, like them, we confine our discussion to the federal Contract Clause.

[4] Our Circuit has previously held that § 1983 provides individuals with a cause of action to assert violations of the Contract Clause. *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam).  We note an apparent split of authority on the question. *See, e.g.*, *Crosby v. City of Gastonia*, 635 F.3d 634, 640–41 (4th Cir. 2011).

The Contract Clause applies to contracts entered into by a State, *Fletcher v. Peck*, 10 U.S. (6 Cranch) 87, 135–39 (1810), as well as by municipalities, and such contracts may be "impaired" within the meaning of the Clause by municipal ordinances as well as by state legislation, *St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 148 (1901).

In order to decide whether the City can prevail over the district court's judgment under the Contract Clause, it is necessary first to set forth the differences between a city or State's breach of a contract, on the one hand, and a city or State's impairment of such contract's obligation, on the other.

## A

The Agreement is a contract between a municipality and a private party. In disputes involving government contracts, it can sometimes be hard to tell whether the governmental entity has "impaired the obligation" of its contract or has simply *breached* its contract with the private party. But the distinction is crucial, not least because conflating the two concepts would risk making a federal constitutional case out of even the most garden variety public contract dispute, transforming the Contract Clause into a font of state contract law. *See Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) ("It would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution."). In fact, the Supreme Court long ago rejected "the proposition that wherever it is asserted on the one hand that a municipality is bound by a contract to perform a particular act and the municipality denies that it is liable under the contract to do so, thereby an impairment of the obligations of the contract arises in violation of the Constitution of the United States." *St. Paul Gaslight Co.*,

181 U.S. at 149.  Such proposition, the Court explained, "amounts only to the contention that every case involving a controversy concerning a municipal contract is one of Federal cognizance, determinable ultimately in this court.  Thus, to reduce the proposition to its ultimate conception is to demonstrate its error."  *Id.*

So how do we tell the difference between a government's impairing the obligation of its contract and simply breaching it?  At the most basic level, it cannot be said to have "impaired" the obligation of its contract if such "obligation" remains in full force and effect.  And our cases establish that the "obligation" of a contract is the judicially enforceable duty it imposes upon each party either to perform or else to submit to the courts' remedial powers, which will often take the form of an order to pay damages, but may encompass other remedies as well (and thus Holmes may have been too hasty in proclaiming that "[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, — and nothing else."  Oliver Wendell Holmes, Jr., *The Path of the Law*, 10 Harv. L. Rev. 457, 462 (1897)).

Given that principle, state action cannot be said to "impair" the obligation of a contract so long as it leaves both parties free to obtain a court-ordered remedy (typically damages) in the event that either of them fails to perform as promised.  And that principle holds true whether state action affects a contract between private parties or, as here, a contract to which the State itself is a party.  *See, e.g.*, *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102 (9th Cir. 1999) ("[T]he substantial impairment test turns on whether the State has used its law-making powers not merely to breach its contractual obligations, but to create a defense

to the breach that prevents the recovery of damages."); *Crosby*, 635 F.3d at 642 n.7 ("If the offended party retains the right to recover damages for the breach, the Contracts Clause is not implicated; if, on the other hand, the repudiation goes so far as to extinguish the state's duty to pay damages, it may be said to have impaired the obligation of contract."); *Horwitz-Matthews*, 78 F.3d at 1251 ("The essence . . . of a breach of contract is that it triggers a duty to pay damages for the reasonably foreseeable consequences of the breach. If the duty is unimpaired, the obligation of the contract cannot be said to have been impaired.").

The Supreme Court's Contract Clause cases likewise reflect the deep connection between obligation and remedy, the upshot being that a State does not "impair the obligation" of a contract so long as it leaves contracting parties free to pursue the ordinary state-law remedies in the event of breach. As the Court explained in *General Motors Corp. v. Romein*, "[t]he obligation of a contract consists in its binding force on the party who makes it." 503 U.S. 181, 189 (1992) (quoting *McCracken v. Hayward*, 43 U.S. (2 How.) 608, 612 (1844)). Thus, a State may "trigger Contract Clause scrutiny" if it enacts "changes in the laws that make a contract legally enforceable," for example, by eroding "the remedies available under a contract" in a way that "convert[s] an agreement enforceable at law into a mere promise." *Id.* But by contrast, a State does not violate the Contract Clause if its challenged action does "not change the legal enforceability of the . . . contracts," *id.* at 190, a condition a State satisfies so long as it does not purport to relieve a party—including, most

especially, itself—of its duty either to perform or to submit to a court-ordered remedy.**[5]**

In a similar vein, *United States Trust Co. of New York v. New Jersey* explained that "[c]ontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid," and thus "[t]he States remain free to . . . abrogate such contractual rights, upon payment of just compensation." 431 U.S. 1, 19 n.16, 29 n.27 (1977).

B

In light of the principles outlined above, it is clear to us that the City has not impaired the obligation of its contract with Pure Wafer, because the Ordinance has not altered the ordinary state-law remedies to which Pure Wafer would otherwise be entitled if it successfully proves a breach of contract. The City might very well have *breached* its contract—a question we discuss later in this opinion—but that does not necessarily mean it has violated the Contract Clause of the federal Constitution.

---

**[5]** To be sure, the Contract Clause does not automatically approve state action that merely alters the remedies available on a contract but stops short of wiping them out entirely; as Justice Cardozo observed (with some understatement), the "dividing line" between obligation and remedy "is at times obscure," and some purely remedial changes may be too "oppressive and unnecessary" to pass muster under the Contract Clause. *W.B. Worthen Co. v. Kavanaugh*, 295 U.S. 56, 60, 62 (1935). We need not linger over such difficulties, however, because as we explain, here the City has not attempted to tinker at all with the remedies Pure Wafer would be entitled to obtain in the event it proves a breach of contract.

Indeed, Pure Wafer included a claim for simple breach of contract in its suit against the City, alleging that "Pure Wafer cannot comply with the Ordinance without incurring substantial costs which the Development Agreement allocated to the City," and specifically requested "such amount of damages as Pure Wafer may establish at any trial of this action as flowing from the City's breach."

Crucially for our purposes here, the City has never asserted the Ordinance as a defense that would have the legal effect of discharging the City's duty to perform and would thereby relieve the City of its legal obligation—established by the contract—to pay damages or some other remedy as a consequence of its non-performance.[6]

But we need not speculate about what legal effect the Ordinance might have on Pure Wafer's entitlement to judicial remedies, because the City has by now several times expressly represented that the Ordinance does not operate to dissolve (that is, impair) its binding obligation to perform whatever it promised to do under the Development Agreement. For instance, as the City put it in briefing following the district court's hearing on Pure Wafer's motion for a preliminary injunction:

> Pure Wafer . . . is suing the City in this case for breach of contract and is seeking money damages. . . . The City is defending this claim based upon the plain terms of the Development Agreement. If Pure Wafer

---

[6] In fact, as noted above, the district court had ordered the trial proceedings bifurcated into a liability phase and a damages phase, something to which the City voluntarily agreed.

> prevails upon its breach of contract claims, the Court will presumably assess damages, to the extent damages are proven and appropriate. In any event, the Pretreatment Ordinance would not frustrate recovery.

Likewise, at the hearing on Pure Wafer's motion for a preliminary injunction, the City represented that "[t]his is a contract dispute as to what the Development Agreement between plaintiff and the city defendant provides. . . . It's a garden-variety contract dispute. . . . They're seeking damages for [the City's] alleged breach of the contract. . . . They're asking for damages if they have to comply because of the breach of contract. . . . The City can respond in money damages if it loses this case at the end of the day."[7]

Although the City has argued that the Ordinance survives Contract Clause scrutiny because any impairment was not substantial, the thrust of that argument was contract based, i.e. that Pure Wafer "agreed to comply with environmental regulations," and that the "cost of regulatory compliance [was] not a term that was bargained for." To the extent the City's argument could be read otherwise, it should go without saying that the City is barred from altering its position on the legal effect of the Ordinance at subsequent stages in this litigation, thanks to the doctrine of judicial estoppel and related principles. *See Whaley v. Belleque*, 520 F.3d 997,

---

[7] We also note that the Agreement goes out of its way to state that "[i]n the event City is in default herein, [Pure Wafer] shall have all legal *and equitable* remedies available to it," and further provides that the Agreement shall be enforceable "subject to a court's equitable powers." The City has not attempted to cast doubt on those provisions. Hence, in addition to damages, Pure Wafer may be able to request injunctive relief or specific performance if it so desires.

1002 (9th Cir. 2008); *State v. Towery*, 920 P.2d 290, 304 (Ariz. 1996) (in banc).

## C

The City's analysis persuades us that Pure Wafer does not have a claim under the Contract Clause. This case has all the hallmarks of a quintessential contract dispute, and insofar as the City has attempted to *refute* Pure Wafer's claimed rights under the Agreement—but has not attempted to render such rights legally unenforceable—it should be treated as a contract dispute. The district court's judgment in favor of Pure Wafer's Contract Clause claim cannot stand.

## III

Nevertheless, Pure Wafer seeks to protect the judgment in its favor on the alternative claim that the City has simply breached the contractual obligations it undertook in the Development Agreement. Although the district court did not rule on this claim outright, it discussed the Agreement at length, considered extensive trial testimony, and made sufficient findings of fact and conclusions of law for us to resolve the scope of the parties' contractual rights without need for a remand.[8]

---

[8] Indeed, the district court itself recognized that "[t]he resolution of the issues in this case hinges on the nature and extent of the City's obligations to accept Pure Wafer's effluent under the terms of the Agreement." Those same inquiries overlap substantially with our breach of contract analysis. Given that the district court, in its Contract Clause analysis, made sufficient findings of fact to conclude that the City had breached the contract, we disagree with the dissent that remand is necessary.

We therefore proceed to the merits,[9] mindful that with respect to any factual findings, "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of

---

[9] The dissent argues that because "we have dismissed the only federal claim before us" we must remand the case back to the district court so that it might determine whether it should continue to exercise supplemental jurisdiction over the breach of contract claim under 28 U.S.C. § 1367(a). Dissent at 33–34. The district court had supplemental jurisdiction, as do we, because the Contracts Clause claim is a federal question. We respectfully disagree with our dissenting colleague.

Section 1367(c) allows a district court to decline to exercise supplemental jurisdiction for one of four reasons. The district court could have invoked it and dismissed the state-law breach of contract claim at any time, but chose not to. And, nothing in this opinion precludes the district court from invoking § 1367(c) after we remand the case back to it. The dissent misreads § 1367(c)(3); it only applies when "the *district court* has dismissed all claims over which it has original jurisdiction." (emphasis added).

The dissent relies on cases such as *Fang v. U.S.* to argue we are improperly usurping the district court's discretion. Dissent at 36–38 (citing 140 F.3d 1238, 1240 (9th Cir. 1998)). But, we are reviewing a district court's merit decision, not instructing the district court on whether to exercise supplemental jurisdiction. *Fang* involved a district court's pre-trial dismissal of federal claims for lack of jurisdiction, and then a dismissal of related state claims pursuant to § 1367(c)(3). *Id.* We reversed in that case, reinstating some of the federal claims and all of the state claims, but made clear the district court could reassess whether it should retain supplemental jurisdiction in the face of the defendant's arguments that the state law claims raised novel issues of state law. *Id.* at 1241–43. Here, we are not dismissing or reinstating any state law claims. The dissent's real objection is that we reach the merits of the breach of contract issue—but that is a separate concern from whether we are usurping the district court's § 1367(c) authority.

fact, it would have weighed the evidence differently." *Anderson v. City of Bessemer*, 470 U.S. 564, 573–74 (1985).

A

The Development Agreement specifies that it "shall be governed by and construed under the laws of the State of Arizona." The Arizona Supreme Court has made clear that "in Arizona, a court will attempt to enforce a contract according to the parties' intent." *Taylor v. State Farm Mut. Auto. Ins.*, 854 P.2d 1134, 1138 (Ariz. 1993) (in banc). Moreover, under Arizona law, "a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct." *Id.* at 1139. Further, courts applying Arizona contract law are not required to find ambiguity in the contractual language before they may entertain extrinsic evidence bearing on the parties' intents. *Id.* at 1140. Rather, we are instructed "first [to] consider[] the offered evidence and, if [we] find[] that the contract language is 'reasonably susceptible' to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties." *Id.* Such practice is permissible so long as the evidence "is being offered to explain what the parties truly may have intended." *Id.*

B

Pure Wafer's theory is that the City promised to accept its effluent so long as its non-pretreated fluoride content remains at or below 100 mg/L, and to bear the financial risk of any future occurrence that would prevent the City from doing so,

including future changes in law.[10]  To Pure Wafer's mind, the Agreement gave it a "contractual . . . right to discharge at [contractually specified] rates up to 195,000 gallons per day of effluent containing up to 100 mg/L of fluoride," and what is more, "[t]he parties agreed that . . . if it became necessary to modify the sewer system so as to permit Pure Wafer to discharge [such] effluent, the City would pay for that modification cost."   In Pure Wafer's view, ADEQ's inauguration of the APP regime has made it "necessary to modify the sewer system" in order to ensure Pure Wafer's ability to discharge its effluent in the manner it believes the Agreement protects—and, Pure Wafer continues, recent regulatory changes are among the future contingencies whose risk the City agreed to shoulder.  In other words, Pure Wafer believes it struck a bargain with the City which "allocated to the City the risk of potential future consequences of its acceptance of . . . Pure Wafer's effluent," including the risk that later-enacted legislation or regulation would require the City to pretreat such effluent as a condition of continuing to accept it.

---

[10] The dissent contends that this breach of contract theory was never articulated by Pure Wafer in its Amended Complaint.  Dissent at 40–41.  It accuses us of inventing a new theory for Pure Wafer.  Yet, Pure Wafer's Amended Complaint articulates this theory several times.  ¶¶ 3, 127, 142.  Its two breach of contract claims incorporate preceding allegations and allege that by failing to exempt Pure Wafer from the Ordinance, as required by sections 9.2 and 14.4 of the Agreement, the City breached its contract.   ¶¶ 149, 154.   The logical conclusion from the Amended Complaint is that by trying to impose a new, lower discharge limit via the Ordinance, rather than exempting Pure Wafer, the City breached the Agreement.  Of course, had the City exempted Pure Wafer it would not be in breach—a point no one contests.

Pure Wafer effectively describes the Agreement as a so-called "regulatory contract," in which a "regulated entity contractually promises the government that [it] will provide or do something that is not otherwise clearly required by extant law.  In return, the government contractually promises the regulated entity to maintain the regulatory regime set out in the contract.  If the government breaches its promise of regulatory stability, it must pay contract damages."  David Dana & Susan P. Koniak, *Bargaining in the Shadow of Democracy*, 148 U. Pa. L. Rev. 473, 475 (1999).

Such contracts are hardly novel.  To take one prominent example, *United States v. Winstar Corp.* involved contracts between the federal government and certain thrift institutions, and the Supreme Court held that in such contracts the government had promised to regulate the thrifts in a specific manner, and to pay them damages if it later changed the regulatory landscape in a way that caused them financial harm.  518 U.S. 839, 871 (1996) (plurality opinion) ("The thrifts do not claim that the [federal government] purported to bind Congress to ossify the law in conformity to the contracts . . . .  They simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury."); *id.* at 887 ("[T]he Government agreed to . . . indemnify its contracting partners against financial losses arising from regulatory change."); *id.* at 916 (Breyer, J., concurring) (explaining that the class of contract at issue amounts to "a promise that obliges the government to hold a party harmless from a change in the law that the government remains free to make"); *id.* at 918 ("The thrifts demonstrate that specific promises were made to accord them particular regulatory treatment for a period of years, which, when abrogated by

subsequent legislation, rendered the Government liable for breach of contract."); *id.* at 923–24 (Scalia, J., concurring in the judgment) ("[I]t is clear from the contract in question that the Government . . . had assumed the risk of a change in its laws.").[11]  As Justice Souter explained, "[c]ontracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows." *Id.* at 869 (plurality opinion).[12]

The contracts at issue in *Winstar* operated in the same manner as Pure Wafer alleges the Development Agreement operates here.  That is, Pure Wafer claims that the Agreement requires the City to give it the benefit of (among other things) whatever fluoride regulations were in force at the time the Agreement was entered into, and that insofar as newly enacted laws (including the Ordinance) frustrate the City's ability to do so, the City is in breach of the Agreement and must submit to whatever remedy the court deems appropriate.

---

[11] *See also, e.g.*, *Amino Bros. Co. v. United States*, 372 F.2d 485, 491 (Ct. Cl. 1967) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government's sovereign act.").

[12] *See also, e.g.*, *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 959 (Fed. Cir. 1993) ("[Government] contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future.  That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third party acts, inclement weather and other *force majeure*." (footnote omitted)).

C

The district court's findings amply support Pure Wafer's position. As the district court recounted, "Pure Wafer presented undisputed evidence that its operations require the discharge of effluent with a fluoride concentration above 16.3 mg/L, that it expected at the time of the Agreement to be able to discharge at concentrations of up to 100 mg/L, that this right was critical to its negotiations based on its past experiences with its San Jose facility, and that the financial viability of the Prescott facility is threatened if it must bear the pretreatment costs." Likewise, the district court concluded that "Pure Wafer was willing to incur the substantial initial capital investment to construct a reclaim facility in Prescott only if the City agreed to commit to maintaining water and sewer services to the facility at the specifications Pure Wafer needed to productively operate its facility," and that "Pure Wafer need only establish that it has the right to discharge at least 100 mg/L, which it has done."

Although the district court did not use the phrase "regulatory contract" as we did above, the district court's findings make unmistakably clear that the parties created such a contract. As the district court put it, the City cannot "force Pure Wafer to pay for pretreatment when the City has contractually agreed to not pass along such costs. The City must accept Pure Wafer's effluent as-is and pretreat it at the City's own expense."

We agree with the district court that the City agreed to accept such effluent as the parties knew Pure Wafer would need to discharge in order to maintain a viable business, and that the City agreed to bear the financial risk that State-initiated regulatory changes would make complying with

such promise more costly than it was when the parties entered into the Agreement.[13]  Hence, the City may not force Pure Wafer to absorb the costs needed to bring the City into line with the terms of its APP.  Enforcing the Ordinance against Pure Wafer would eviscerate the benefit of Pure Wafer's bargain; the City cannot do so without putting itself in breach of the Agreement.

Our conclusion is bolstered by representations the City itself made in a letter to ADEQ in the summer of 2004, in which the City explained that it had "signed an agreement with [Pure Wafer] on 2/11/97 allowing them to discharge Fluoride between 50 mg/l and 100 mg/l" into the City's AWRF.  And our conclusion derives further support from the district court's finding that "[a]s early as 1994, ADEQ informed the City that its Groundwater Quality Protection Permit would no longer be sufficient for the operation of the AWRF," and that, consequently, the City was "[c]learly . . . aware at the time it entered into the Agreement that there existed some level of fluoride concentration that would require treatment prior to its ultimate discharge," but had "inaccurately estimated the particular fluoride concentration above which treatment (or pretreatment) [would be] required."  The City's ability to anticipate stricter discharge limitations like those ADEQ ultimately passed defeats any impossibility defense the City might have asserted, because it means the "non-occurrence" of such regulatory change was not a "basic assumption on which the contract was made." Restatement (Second) of Contracts § 261 (1981); *see also id.* § 264, cmt. a ("With the trend toward greater governmental

---

[13] We disagree with the district court's determination that the City is obligated to accept Pure Wafer's effluent "regardless of its fluoride concentration," but this error is irrelevant to the outcome of the case.

regulation, . . . parties are increasingly aware of [the] risks [that new government regulations will frustrate performance], and a party may undertake a duty that is not discharged by such supervening governmental actions . . . . Such an agreement is usually interpreted as one to pay damages if performance is prevented . . . ."); 12 Joseph M. Perillo, Corbin on Contracts § 64.10 (rev. ed. 1993) (explaining that in some cases where post-formation changes in law render performance illegal, "damages are still available as a remedy, either because the promisor assumed the risk or for other reasons").

### D

The City's most basic counterargument is that the Ordinance is an "environmental regulation" of the sort Pure Wafer expressly agreed to obey, in section 9.1 of the Agreement. "No further analysis is required," says the City. We are not persuaded.

The trouble with the City's argument is it completely ignores the context of the parties' negotiations. As the district court put it, "Pure Wafer would not construct the Prescott facility without a commitment from the City that it could discharge up to 100 mg/L of fluoride," for it "did not want to build a Prescott facility that could be 'rendered useless at any time by the City.'" Much like the financial institutions in *Winstar*, "[i]t would . . . have been madness for [Pure Wafer] to have engaged in these transactions with no more protection than the Government's reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed." 518 U.S. at 910 (plurality opinion).

The district court concluded that "[a]ccording to the City's logic, this violation of the Agreement is not a breach of contract because Pure Wafer agreed not to discharge effluent in violation of local environmental regulations. But Pure Wafer neither anticipated nor agreed that it would comply with cost-shifting regulations cloaked as environmental regulations." For the reasons explained above, we agree with the district court that Pure Wafer was not so reckless with its own future, and so we cannot accept the City's position that by agreeing to section 9.1, Pure Wafer unwittingly welcomed a Trojan Horse containing within itself the seeds of destruction of its own business.

The City also derives no help from the "reserved powers doctrine," which holds generally that "the exercise of the police power cannot be limited by contract for reasons of public policy; nor can it be destroyed by compromise," for "it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety." *N. Pac. Ry. Co. v. Minnesota*, 208 U.S. 583, 598 (1908). Pure Wafer is not arguing that the City promised never to adopt regulations limiting the amount of fluoride industrial users like itself may discharge into the City's sewer system. And giving Pure Wafer a contractual remedy for the City's breach would not block the City from reducing the amount of fluoride exiting the City's AWRF. As the City itself recognizes, "ultimately the only question is who should pay the cost of bringing the Facility into compliance with the amended City Code." Indeed, the district court found that "if Pure Wafer does not pretreat its effluent, the City will do so to comply with its APP. Counsel for the City has suggested as much to the Court." The City would not be forced to surrender any of its sovereign powers if it is held to its promise to bear the risk that a change in applicable laws

might make performance under the Development Agreement more costly.

## E

In light of the foregoing, we conclude that while the City prevails on its appeal of the Contract Clause issue, judgment for Pure Wafer can be sustained on the alternative ground that the City has breached its contract with Pure Wafer. We leave it for the district court on remand to decide the appropriate remedy.[14]

## IV

The judgment of the district court is **AFFIRMED IN PART** and **REVERSED IN PART**, and the case is **REMANDED** for further proceedings consistent with this opinion. The district court's injunction forbidding enforcement of the Ordinance against Pure Wafer shall remain in effect during subsequent stages in this litigation. Each party shall bear its own costs on appeal.

---

[14] Because we affirm the district court's judgment as to the City's liability, we also **AFFIRM** its denial of the City's counterclaim. We have no occasion to examine the City's objection to the district court's separate judgment that Pure Wafer is entitled to attorneys' fees.

In addition, Pure Wafer's two motions for judicial notice, filed April 12, 2016, and April 13, 2016, are **GRANTED**.

N.R. SMITH, concurring in part and dissenting in part:

## I. United States and Arizona Constitutional Contract Clause Claims

I concur with the majority's conclusion that "Pure Wafer does not have a claim under the Contract Clause" of the United States or Arizona Constitutions. Maj. Op. 22. Thus, I agree that the judgment must be reversed and remanded.[1]

## II. Arizona Breach of Contract Claims

However, I must dissent from the majority's sua sponte decision to reach Pure Wafer's alternative claims that the City breached the Development Agreement. Instead, we should remand for the district court (1) to consider whether to exercise supplemental jurisdiction over the breach of contract claims, and (2) (if it decides to exercise such jurisdiction) to make findings of fact as to those claims.

  A. *We must allow the district court to assess in the first instance whether to exercise its supplemental jurisdiction.*

In holding the Contract Clause inapplicable to this case, we have dismissed the only federal claim before us. Thus, only claims for breach of contract under Arizona state law remain. Pure Wafer invoked supplemental jurisdiction over these claims in the district court but did not plead diversity. Therefore, the first question must be whether the federal,

---

[1] I also agree that the City should continue to be enjoined from enforcing the Ordinance against Pure Wafer during subsequent stages of this litigation.

rather than the Arizona state, court should decide the remaining claims. *See Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988). The majority errs in failing to allow the district court to consider in the first instance whether to exercise its supplemental jurisdiction.

Although district courts generally have supplemental jurisdiction over state law claims forming "part of the same case or controversy" as federal claims, there are a number of circumstances in which "[t]he district court may decline to exercise [this] jurisdiction," including when all federal claims have been dismissed. *See* 28 U.S.C. § 1367(a), (c). The decision is discretionary, and, if one of the § 1367(c) circumstances is present, "the exercise of discretion [is] triggered." *Exec. Software N. Am., Inc. v. U.S. Dist. Court for Cent. Dist. of Cal.*, 24 F.3d 1545, 1557 (9th Cir. 1994), *overruled on other grounds by Cal. Dep't of Water Res. v. Powerex Corp.*, 533 F.3d 1087 (9th Cir. 2008). Section 1367 plainly vests this discretion with the *district* court. *See* 28 U.S.C. § 1367(c); *see also Foster v. Wilson*, 504 F.3d 1046, 1051 (9th Cir. 2007) ("The decision whether to continue to exercise supplemental jurisdiction over state law claims after all federal claims have been dismissed lies within *the district court's discretion*." (emphasis added)); *Exec. Software*, 24 F.3d at 1557 ("[S]ubsection (c) [of § 1367] requires *the district court*, in exercising *its discretion*, to undertake a case-specific analysis." (emphasis added) (quoting H.R. No. 734, 101st Cong. § 29 (1990))); *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992) (providing that once all federal claims are dismissed, the exercise of jurisdiction over state law claims "is within *the discretion of the federal district court*" (emphasis added)), *overruled on other grounds by Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005) (en banc).

Once it dismisses all federal claims before it, a federal court "must reassess its jurisdiction by engaging in a pragmatic and case-specific evaluation of the myriad of considerations that may bear on the determination of whether to exercise supplemental jurisdiction." 16 James WM. Moore et al., *Moore's Federal Practice* § 106.66[1] (3d ed. 2016). Such considerations include "economy, convenience, fairness, and comity." *Exec. Software*, 24 F.3d at 1557 (quoting *Imagineering*, 976 F.2d at 1309). These factors must be "weigh[ed] in each case, and at every stage of the litigation," *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 173 (1997) (quoting *Carnegie–Mellon*, 484 U.S. at 350), and the district court is in the best position to weigh them, *see Hoeck v. City of Portland*, 57 F.3d 781, 785–86 (9th Cir. 1995); 16 Moore, *supra* § 106.66[3][a]. In my view, an Arizona court would be better suited to adjudicate Pure Wafer's claims based on Arizona law. However, the district court should make that decision.

Because the discretion lies with the district court and it is in the best position to make the decision, several of this court's opinions indicate that we should allow the district court the first opportunity to consider the issue. *See Watison v. Carter*, 668 F.3d 1108, 1117 (9th Cir. 2012) ("On remand [after appellate ruling negated the district court's basis for dismissing state law claims], the district court . . . shall decide anew whether to exercise supplemental jurisdiction."); *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163, 1174–75 (9th Cir. 2002) ("The decision to exercise [supplemental] jurisdiction remains discretionary with the district court. . . . We therefore remand for the district court to determine, in the first instance, whether the application of the *Gibbs* standard permits the exercise of supplemental jurisdiction, and to exercise discretion over whether such jurisdiction would be

appropriate in the context of this litigation."); *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 790 (9th Cir. 1996) ("The Attorney Defendants ask us to dismiss the state law claims against them for lack of pendent jurisdiction. The district court may, in its discretion, refuse to exercise supplemental jurisdiction after considering 28 U.S.C. § [1367].[2] *We will not examine the necessary factors in the first instance.*" (emphasis added)).

In *Fang v. United States*, the plaintiff filed federal and state law claims against the United States based on her daughter's death in a national park. 140 F.3d 1238, 1240 (9th Cir. 1998). The district court granted summary judgment on the federal claims for lack of subject matter jurisdiction under the Federal Tort Claims Act. *Id*. It also dismissed the state law claims for lack of subject matter jurisdiction under 28 U.S.C. § 1367(c)(3). *Id*. On appeal, after deciding to reverse the district court's dismissal of the federal claims, we considered the dismissal of the supplemental claims. *Id.* at 1241–43. We reasoned that, because the federal claims "were erroneously dismissed, the reason for dismissing the remaining supplemental claims no longer exist[ed]." *Id.* at 1244. Declining to rule on the defendants' arguments that complex state law questions and predominance of state law issues called for us to uphold the dismissal of the state law claims, we held:

> The decision to exercise supplemental jurisdiction is within the discretion of the

---

**2** *Webster* cites 28 U.S.C. § 1366, concerning "laws applicable exclusively to the District of Columbia," which were not at issue in that case. The citation to § 1366 is clearly a typographical error that was intended to cite 28 U.S.C. § 1367.

> district court and that court must be given an opportunity to make that decision. We therefore remand the case to the district court where it can determine whether it should retain jurisdiction over the state law claims in light of [these] alternate arguments.

*Id*.

In *Hunsaker v. Contra Costa County*, the plaintiff brought disparate impact disability claims under both federal and state law, seeking a permanent injunction. 149 F.3d 1041, 1042 (9th Cir. 1998). The district court ordered the injunction on the federal claim. *Id*. This court reversed, holding that there was no violation of the federal law. *Id.* at 1044. Over the plaintiff's argument that we should, nonetheless, uphold the injunction under the alternative state law claim, we held, "[t]he district court did not rule on this claim, and we have nothing to review. We should allow the district court to consider this claim in the first instance or, in its discretion, decline to exercise supplemental jurisdiction." *Id*.

Here, the district court initially exercised supplemental jurisdiction over the state law breach claims but ultimately dismissed them as moot, based on its ruling on the constitutional claims. As in *Fang*, our disposition of the federal claims on appeal negated the basis on which the district court dismissed the state law claims. In *Fang*, we could have ruled on whether the plaintiff's claims presented novel state law issues that substantially predominated over the federal claims, which could have disposed of the state claims. However—recognizing (1) that deciding whether to exercise supplemental jurisdiction is a discretionary question for the district court, and (2) ruling on the defendants'

alternative arguments would have deprived the district court the opportunity to decide in the first instance whether to exercise that jurisdiction—we remanded so the court in the best position to rule on the jurisdiction issue could do so. *See Fang*, 140 F.3d at 1244. The present case compels the same result. As in *Hunsaker*, the district court did not rule on the alternative state law basis for the judgment. 149 F.3d at 1044. Therefore, we have nothing to review with respect to that alternative basis, and "[w]e should allow the district court to consider [the breach of contract claims] in the first instance or, in its discretion, decline to exercise supplemental jurisdiction." *See id*.

B. *Because the district court held that the breach claims were moot, it made no factual findings specific to those claims, and we err in failing to remand for factual findings now that the claims are no longer moot.*

Even if we knew the district court would decide to exercise supplemental jurisdiction, remand would still be necessary, because the district court made no factual findings with respect to the breach of contract claims.

Although pure interpretation of language in a contract is a question of law, *see Grosvenor Holdings, L.C. v. Figueroa*, 218 P.3d 1045, 1050 (Ariz. Ct. App. 2009), the primary purpose of contract law in Arizona is to determine the parties' *intended meaning* of the contract at the time of formation, *see Taylor v. State Farm Mut. Auto. Ins. Co.*, 854 P.2d 1134, 1138–40 (Ariz. 1993) (in banc), which "is a question of fact left to the fact finder," *Chopin v. Chopin*, 232 P.3d 99, 102 (Ariz. Ct. App. 2010). In cases where extrinsic evidence is used to determine the parties' intent from multiple reasonable

interpretations of contractual language, the interpretation of the contract will generally also become a question of fact. *See In re Estate of Pouser*, 975 P.2d 704, 709 (Ariz. 1999); *Taylor*, 854 P.2d at 1144–45. Likewise, "[w]hether a party has breached [the] contract is a question of fact." *Great W. Bank v. LJC Dev., LLC*, 362 P.3d 1037, 1045 (Ariz. Ct. App. 2015). We must allow the district court an opportunity, in the first instance, to make these factual determinations for Pure Wafer's breach of contract claims.

In its order, the district court found the breach claims moot in light of how it disposed of the constitutional claims. This treatment of the breach claims resulted in the court devoting only about one-quarter of a page (out of a thirty-two page opinion) directly to these alternative claims. And even that minimal space includes no findings of fact specific to the breach claims, instead providing that the district court "need not reach Pure Wafer's alternative [contract] claims." Because the district court found the breach claims moot based on the premise that the constitutional claims were valid, our ruling today has removed the only basis on which the district court dismissed those claims. Therefore, the breach claims must be revived. *See Fang*, 140 F.3d at 1243–44 (reinstating state law claims where, after court of appeals' ruling, district court's "reason for dismissing the remaining supplemental claims no longer exist[ed]"). Although the breach claims are revived—because (1) we have negated the only conclusion the district court reached with respect to these claims, and (2) the district court made no factual findings specific to the breach claims—there is nothing for this court to review concerning the claims at this stage. Instead, by deciding the breach claims, the majority steps into the role of fact-finder, *see United Cal. Bank v. Prudential Ins. Co. of Am.*, 681 P.2d 390, 454 (Ariz. Ct. App. 1983) (resolving evidentiary

questions is the role of the district court), without the benefit
of district court findings concerning these claims, and relying
only on findings the district court made in the context of
constitutional claims that we hold today to be invalid.

C. *The majority decides this case based on the breach of
contract claims it believes Pure Wafer should have
alleged, instead of addressing the claims Pure Wafer
actually alleged.*

In addition to assuming the district court's role of fact-
finder, the majority's breach of contract analysis fails to even
mention the only two provisions Pure Wafer actually alleged
in its complaint that the City breached. The complaint alleged
the City breached the Agreement (1) under section 14.14 by
failing to exempt Pure Wafer from the 2013 ordinance, and
(2) under section 9.2 by failing to exempt Pure Wafer from
the 2013 ordinance. According to the majority, Pure Wafer
alleged "that the City, by enacting the Ordinance, had
committed at least two different breaches of contract." Maj.
Op. 12–13. Although this initial statement about the breach
claims is accurate, when the majority actually discusses the
substance of those claims it does not once cite to, or analyze
the content of, section 14.14 or section 9.2 of the Agreement.
The majority also asserts that "Pure Wafer included a claim
for simple breach of contract in its suit against the City,
alleging that 'Pure Wafer cannot comply with the Ordinance
without incurring substantial costs which the Development
Agreement allocated to the City.'" *Id.* at 19–20. While, again,
the majority correctly recognizes that Pure Wafer included
breach of contract claims, it implies, incorrectly, that Pure
Wafer alleged facts concerning cost allocation specifically in
the context of its breach claims. Pure Wafer did not. Instead
of considering the breach claims as Pure Wafer alleged them,

the majority analyzes the breach claims it believes Pure Wafer should have alleged, rules in Pure Wafer's favor on those claims, and never addresses the breach claims Pure Wafer actually alleged in its complaint.

    D. *The majority's analysis of the breach claims contradicts a plain reading of the Agreement, fails to address several relevant provisions, and demonstrates that further factual development may be needed.*

As noted, the primary goal of Arizona contract law is to determine the parties' intended meaning of their agreement and to give effect to that contractual intent. *See Taylor*, 854 P.2d at 1138–40. Thus, in attempting to discover the parties' intent, courts are to liberally consider extrinsic evidence to show the parties' intended interpretation of their contractual language. *See id.* at 1138–41. However, because "[i]nterpretation is the process by which we determine the meaning of words," *see id.* at 1138, extrinsic evidence is useful only to the extent it reveals how the parties' intent is reflected in the words they chose to memorialize their agreement, *see id.* at 1140–44; *see also Smith v. Melson, Inc.*, 659 P.2d 1264, 1266 (Ariz. 1983) (in banc) ("A contract should be read in light of the parties' intentions as reflected by their language and in view of all the circumstances."). And the further an interpretation gets from the contract's actual language, the more convincing the extrinsic evidence must be to show the parties intended that meaning. *See Taylor*, 854 P.2d at 1139–40. In addition, the parties' intent for specific contractual language must be determined in light of their entire agreement. *See Smith*, 659 P.2d at 1267.

At the heart of the parties' dispute are two difficult, interrelated issues: (1) the limits of Pure Wafer's right to

discharge into the City's sewer, and (2) who bears the cost of bringing that discharge into compliance with Arizona Department of Environmental Quality (ADEQ) requirements. The majority appears to rely exclusively on section 4.2 of the Agreement to answer these questions. Although its interpretation could be valid, it fails to analyze the specific language of the provision on which it relies. Further, the majority fails to consider several other provisions implicated here. When read as a whole, the Agreement is clearly susceptible to multiple reasonable interpretations with respect to these issues.

> 1. *The majority's interpretation of Pure Wafer's discharge rights contradicts section 4.2's plain meaning and has insufficient supporting extrinsic evidence to overcome that contradiction.*

The parties dispute what limits the Agreement places on Pure Wafer's right to discharge, and the City's obligation to accept, wastewater into the City's sewer system. Section 4.2 requires the City to provide Pure Wafer 195,000 gallons of daily "sewer capacity." It further provides that the "City shall not reclassify [Pure Wafer's] effluent" for purposes of sewer usage rates "unless there is a material change in the waste water quality from the specifications attached hereto as Exhibit F." Exhibit F, in turn, lists 50 mg/L as the "typical value" for fluoride and 100 mg/L as the "maximum."

Contrary to the findings of the district court, the majority concludes Pure Wafer only has a right to discharge wastewater of up to 100 mg/L fluoride. *See* Maj. Op. 8, 28, 30. The majority relies on Exhibit F for this limit. *See id.* at 8–9. It also relies on certain extrinsic evidence: (1) testimony that, at the time of the Agreement, Pure Wafer expected to

discharge up to 100 mg/L fluoride and this understanding was critical to its negotiations, *id.* at 28; (2) a 2004 letter indicating that a City employee understood Pure Wafer to have such a right, *id.* at 29; and (3) letters from ADEQ to the City prior to the Agreement reflecting that the City knew it must obtain an aquifer protection permit, *see id.* at 29.

The district court below persuasively analyzed, and found antithetical to the Agreement's plain meaning, the conclusion the majority now reaches as to Pure Wafer's discharge rights. Though section 4.2 obligates the City to supply sewer capacity, it does not provide that Pure Wafer has a right to discharge wastewater (through that capacity) with any specified level of pollutants, or that there are any limits (regardless of fluoride content) on what Pure Wafer may send through its 195,000 daily gallons of sewer capacity.

Exhibit F's plain language cannot be read to impose discharge limits, as the majority asserts. The district court persuasively rejected the argument that Exhibit F established any measure of Pure Wafer's right to discharge effluent of a particular fluoride content, and instead, held that no contract provision could reasonably be interpreted to set such a limit. The Agreement refers to Exhibit F only once. A plain reading of that reference shows Exhibit F does not create any right to discharge a certain amount of fluoride, but rather, relates only to "sewer usage fees" Pure Wafer must pay for "sewer capacity" under section 4.2. This reading was confirmed by Pure Wafer's only trial witness, who was involved in the original planning of the Prescott facility. He testified that Exhibit F did not relate to any right for Pure Wafer to discharge certain contaminant levels but, instead, related only to pricing.

Although the majority points to extrinsic evidence to support its position, it fails to address the interpretation problem pointed out by the district court—that there is no provision in the Agreement, *the words of which* we could reasonably interpret to impose a 100 mg/L limit. There is no better indication of contractual intent than a plain reading of the language the parties chose to express their rights and obligations in the Agreement. And, here, that language does not support the majority's position. Extrinsic evidence is persuasive only to the extent that it shows the parties' intent through the meaning of the contractual language, *see Taylor*, 854 P.2d at 1140–44; *Smith*, 659 P.2d at 1266, and the further an interpretation varies from the written language, the more convincing the evidence must be to show the parties intended the proffered interpretation, *see Taylor*, 854 P.2d at 1139–40. The evidence on which the majority relies does not clear this bar. Neither does the majority address the testimony of Pure Wafer's only witness, which contradicts the majority's reading of Exhibit F. Based on the conflicting interpretations of the parties' intended rights and obligations concerning discharge, at the very least, the district court should be permitted to determine the facts in the context of Pure Wafer's breach of contract claims. And, if on remand, there is not persuasive evidence as to the parties' actual intent, any remaining ambiguity in the parties' rights and obligations should be interpreted against Pure Wafer as the party who drafted the agreement. *See Polk v. Koerner*, 533 P.2d 660, 662 (Ariz. 1975). Interpretation against the drafter is particularly applicable where the "party is attempting to impose an obligation on another where otherwise such an obligation would not exist." *United Cal. Bank*, 681 P.2d at 412.

2. *The majority's interpretation of the Agreement's cost allocations contradicts the plain meaning of section 4.2 and ignores several provisions relevant to the financial obligations.*

The parties' discharge rights and obligations also relate to a second question at issue here: When environmental laws allow the City to release wastewater into the aquifer only if its fluoride content is below a certain level, and it is undisputed that Pure Wafer's discharge causes excess fluoride levels, who bears the cost of abatement? The majority interprets section 4.2 to impose the cost on the City. *See* Maj. Op. 7–8, 24–29. It posits that, by agreeing to take Pure Wafer's discharge, the City agreed to bear the cost if the law required purification to reduce the fluoride. However, this reading contradicts section 4.2's plain meaning and fails to consider several other provisions that appear to affect the parties' financial obligations.

Section 4.2 expresses when and how (logistically) the City provides "sewer capacity" to Pure Wafer: It must hold 195,000 gallons of physical carrying capacity in "reserve in its sewer disposal system at all times after commencement of construction of the Facility." Section 4.2 refers to existing "[t]runk line facilities . . . currently in place [that] appear[ed] adequate" to provide this carrying capacity. However, if the trunk line facilities "prove[d] inadequate," the "City [was] obligated to augment such facilities . . . by constructing at no cost to [Pure Wafer] all mains, lines, and other facilities necessary to accept or accommodate the additional sewer flow or effluent from the facility."

The majority suggests the City's obligation to "augment [inadequate] facilities" amounts to a "regulatory contract"

under which the City guaranteed Pure Wafer the benefit of the regulatory scheme existing at the time of the Agreement by agreeing to bear the cost of any changes. Maj. Op. 7–8, 24–29. However, a plain reading of section 4.2 requires only that the City make available a specified amount of physical space in the sewer system to accommodate Pure Wafer's discharge. And, if the sewer lines existing at the time of the Agreement turned out to be insufficient to handle the required volume of discharge, section 4.2 placed the financial burden on the City to augment only the physical capacity of those lines to accommodate the additional discharge that could not otherwise physically fit through the system. *See United Cal. Bank*, 681 P.2d at 425 (explaining that where a contract includes general terms that accompany specific terms covering the same subject matter, "the meaning of the general terms is presumed to be limited [by] the enumerated specific terms and to include only those things of the same nature as those specifically enumerated").

The majority again fails to explain how the language of section 4.2 supports its position. The section does not impose an obligation to build some extensive purification facility, unrelated to the sewer's physical capacity to accept a certain volume of wastewater through its pipes. Some extrinsic evidence may support the majority's position, but again, that evidence is persuasive only to the extent it can be tied back into the actual language of the Agreement, *see Taylor*, 854 P.2d at 1140–44; *Smith*, 659 P.2d at 1266, which the majority has failed to do. Instead, a plain reading of section 4.2 supports a more reasonable alternative. Given the conflicting interpretations, the district court should be given the opportunity to make findings of fact—in the context of Pure Wafer's breach of contract claims—as to the parties' understandings of the language in section 4.2. And if, at that

point, ambiguity remains as to their intended meaning, that ambiguity should be resolved against Pure Wafer as the drafting party. *See Polk*, 533 P.2d at 662; *United Cal. Bank*, 681 P.2d at 412.

In addition to section 4.2's plain meaning, several other provisions may bear on the parties' financial obligations under the contract. Yet the majority has limited its analysis to section 4.2 in isolation. *See Smith*, 659 P.2d at 1267. Read as a whole, article 4 of the Agreement may also speak to the parties' cost allocations. For example, the detail with which they allocate risk in section 4.3 tends to negate an interpretation that section 4.2 makes allocations not explicitly stated. Under circumstances not present here, section 4.3 expressly places on Pure Wafer:

> responsib[ility] for any engineering and construction associated with the connection to that infrastructure[, which shall] include, but not be limited to, metering and sampling devices and structures, pipeline, pump stations, etc. . . . [Pure Wafer] shall be responsible for sampling and testing costs. . . . In the event that [Pure Wafer] discharges effluent of an inferior quality than is required by permit, and the City's facilities are negatively impacted, [Pure Wafer] shall be financially responsible.

Because some sections allocate the responsibilities, risks, and costs in such detail, it is reasonable to assume that the parties would have made similar explicit allocations in section 4.2, if they intended section 4.2 to have that effect.

The Agreement may also allow "surcharges" to Pure Wafer if its fluoride levels increase the City's processing costs. Section 4.1, "Operations Water Supply," provides that "Water Supply shall be at City's sole expense, without any special assessments, costs, [or] surcharges." Section 4.2 contains no protection against surcharges. Further, Pure Wafer's only witness testified that section 4.2 and Exhibit F allow the City to charge higher sewer rates as discharge contaminants increase "because it will cost [the City] more to process." His testimony indicates the parties may have understood, upon executing the Agreement, that if the quality of Pure Wafer's discharge increased the City's processing costs, the increased costs could be passed on to Pure Wafer.

While section 4.2 provides cost protections to Pure Wafer, these protections may not prohibit increased processing costs. Section 4.2 prohibits increasing Pure Wafer's "sewer usage fees" absent "a material change in the waste water quality." It also provides, "Sewer Capacity shall be at no cost" to Pure Wafer other than "normal sewer usage fees." As noted, section 4.2 indicates "sewer capacity" refers only to physical sewer space to carry away discharge. Therefore, it would not preclude discharge-related charges for something other than that physical space, such as a surcharge for the City's extra costs of processing the excess fluoride. Such a "surcharge" would not amount to a "normal sewer usage fee" protected under section 4.2, nor would it be assessed for "sewer capacity."

In addition, evidence of the parties' dealings as to the excess-fluoride costs may show their understandings of cost allocations. *See United Cal. Bank*, 681 P.2d at 418 (explaining that the parties' treatment of terms after the contract is executed but before a dispute as to meaning arises

"is entitled to great weight" as evidence of the parties' intended meaning for those terms). During the period of their Agreement, the City accepted Pure Wafer's discharge regardless of quality. However, whenever ADEQ found the City in violation of fluoride limits, the City demanded Pure Wafer's help to remedy the problem. And the record reflects Pure Wafer did help. Although some evidence suggests Pure Wafer provided the assistance despite having no obligation to do so, other evidence suggests Pure Wafer believed it was obligated to help bear these costs: A 2004 letter from Pure Wafer to the City (following the City's Notice of Violation (NOV) from ADEQ) outlined, "It is [Pure Wafer's] intent to work with the City to assure that its discharge . . . will enable the City to consistently meet all of its permit requirements, including fluoride." The letter also explained Pure Wafer's plan to reduce fluoride concentrations. Finally, the letter provided that "the NOV issued to the City is directly related to our operations and potential remedial solutions may require expenditures on our part." Other 2004 letters indicate that Pure Wafer hired an environmental engineer to determine how to reduce fluoride levels. Pure Wafer's reduction of fluoride when its discharge caused the City to exceed permitted levels tends to contradict Pure Wafer's position that it had a right to discharge wastewater with any fluoride content. Given these interpretation problems, the district court should have the first chance to determine the facts as to all of the matters that may have affected the parties' understandings of their cost allocations.

A final contract provision that may bear on the parties' financial obligations is section 12, "Force Majeure." Both parties claim it would cost several million dollars to achieve compliant fluoride levels. Given this burden, both parties might claim defenses under section 12, which protects a party

from defaulting where "inability to perform [is] due [to] . . . acts or the failure to act, of any utility, public or governmental agent or entity . . . beyond the control or without the fault of such party." Changes to environmental laws imposing new burdens on either party could possibly amount to governmental action beyond the control and without the fault of the parties. But the district court should be given the first opportunity to make factual determinations as to the parties' understandings of the scope of this provision.

In sum, the majority errs in failing to consider (in any manner) many of the provisions that may bear on the issues before us and in failing to recognize that the provisions on which it relies are subject to competing interpretations by Pure Wafer and the City. We should allow the district court to make the factual determinations with respect to these issues in the first instance.

    E. *Without allowing the district court an opportunity to consider the question, the majority bases its decision on a record that may be insufficient to show the parties' contractual intent.*

In addition to the lack of written findings as to the breach claims, a review of the present record suggests that the abbreviated proceedings in the district court may not have allowed for admission of extrinsic evidence sufficient to show the parties' contractual intent. The district court should be permitted on remand to determine whether, under Arizona contract law, the record is adequately developed with facts that show what the parties truly intended their agreement to mean.

    *1.  Lack of attention to the breach claims indicates that the parties have not adequately developed the record as to those claims.*

The history of this case evidences that the proceedings may not have sufficiently developed the record on the breach claims to allow a proper ruling on the merits. The parties conveyed their initial expectations for the timing of all the claims in this case in their joint December 2013 planning report, where they estimated that discovery would take until the end of April 2014 and the case would be ready for a three- or four-day trial at the end of May. Instead of progressing pursuant to this expected timeline, the evidentiary proceedings in the district court were completed within five weeks of the parties filing their initial planning report and concentrated almost exclusively on the constitutional claims.

Pure Wafer did not include breach of contract claims in its initial complaint. Although Pure Wafer later amended to add the breach claims at issue, it then immediately moved for a preliminary injunction, making no argument that its breach claims justified an injunction or that the claims would eventually succeed on the merits. Instead, its motion sought an injunction "pending a final judgment determining Pure Wafer's *constitutional claims*." The motion referred to the breach claims only once, representing that Pure Wafer "add[ed] purely alternative claims for breach of contract . . . and breach of the implied covenant of good faith and fair dealing . . . [and that g]iven the City's stated positions, those claims would not succeed and [were] asserted only in the alternative . . . out of an abundance of caution." It was with this perspective toward the breach claims that the parties and district court would have prepared for the preliminary

injunction hearing, which the court scheduled for December 19, 2013.

The district court limited each party to only three and one-half hours to present evidence and argument. Thus, Pure Wafer called only one witness during its presentation-in-chief. At the close of the first day (during which the City also called only one witness), the district court suggested they proceed immediately with a trial on the merits, consolidate it with evidence heard on the motion for preliminary injunction, and finish presenting the evidence on the next available court date (January 14, 2014). The parties agreed to the district court's suggestion. The court's subsequent order provided that the remainder of trial would be limited to the City calling one more defense witness and Pure Wafer calling one rebuttal witness (the same witness it called in its direct presentation). The order also provided in a footnote that "the trial necessarily includes the issue of liability on any claims pleaded in the alternative, namely Pure Wafer's alternative claims for breach of contract and breach of the implied covenant of good faith." In other words, trial of the alternative claims was ordered only after Pure Wafer completed its presentation-in-chief, which focused primarily on the preliminary injunction on the constitutional issues. Indeed, when both parties would have been planning which witnesses to subpoena, which to call, what questions to ask, and what other evidence to present, they would have made those decisions understanding that their presentations needed to pertain only to Pure Wafer's entitlement to a preliminary injunction based exclusively on its constitutional claims. And they certainly would not have made these decisions with the understanding that they needed to try their entire cases, which they had estimated (in their initial planning report) would not be ready for five more months. This approach to the

evidentiary proceedings below highlights why the parties and district court did not attempt to develop the record for the breach of contract claims.

Like the evidentiary portion of trial and every prior filing in the case, the post-trial briefing and proposed findings and conclusions only superficially addressed the breach claims. As noted, the district court's opinion devoted less than one-quarter of a page (out of thirty-two pages) to the breach claims, holding that they need not be reached and dismissing them as moot.

The parties' treatment of the breach of contract claims on appeal further supports the conclusion that the parties and district court did not attempt to develop the record for the purpose of addressing those claims. The only reference the parties' briefing made to the claims was in the City's opening brief: "Pure Wafer's breach of contract claims . . . were dismissed as moot and are not at issue on this appeal." Pure Wafer never disputed this position. Indeed, when asked at oral argument, neither party was prepared to address the appeal as a breach of contract case. We asked the City, "is there a reason we can't treat [this case] as a contract issue?" The City answered, "I don't think the record is developed to that—that the findings of fact and conclusions of law are developed to that level to permit you to do that."[3]

---

[3] This questioning occurred during the City's rebuttal. The panel initially raised the issue in its first question during Pure Wafer's argument, only after the City had already completed its argument-in-chief without being asked to argue its position on the issue. Because the panel spent the majority of Pure Wafer's argument exploring whether we could approach the case as a breach of contract dispute, it is troubling that the panel did not raise the issue at a time that would ensure the City an equal opportunity to address it.

Pure Wafer was equally reluctant to agree that the case could appropriately be decided as a breach of contract claim on the present record. Even in response to the question, "can you still prevail in this particular appeal by persuading us that the district court made enough findings to establish that this was a breach of contract," Pure Wafer never adopted that position. As its argument came to a close, Pure Wafer conceded that the parties' cost allocations for reducing fluoride was a term fully covered by the Agreement. Following this concession, however, we clarified whether Pure Wafer thought that (because the term was covered by the Agreement) the case could be decided on a breach of contract theory, rather than by reaching the constitutional issue. Pure Wafer reluctantly answered, "Maybe." This ambivalent response (the last word of Pure Wafer's argument) typifies the parties' and district court's perspective of the breach claims throughout this case.

> 2. *Having clearly not focused on the breach of contract claims, the proceedings up to this point may have left the factual record without adequate evidence of the parties' contractual intent.*

In light of Arizona's goal of giving effect to the parties' intent, the Arizona Supreme Court in *Taylor* explained the great extent to which the state allows parties to offer extrinsic evidence to show their understandings of contractual language, and thus, their contractual intent. *See* 854 P.2d at 1138–41. In analyzing the meaning of language and how it shows the parties' intent, Arizona has expressly rejected the requirement "to make a preliminary finding of ambiguity" before the court can consider extrinsic evidence. *See id.* at 1138. Instead, the court must consider *all* extrinsic evidence that may support a party's reasonable interpretation of

contractual language as showing the party's theory of contractual intent. *See id.* at 1139. Under this more liberal approach, Arizona allows the court to "consider surrounding circumstances, including negotiation, prior understandings, . . . subsequent conduct," and the like in  interpreting the contract. *See id.* at 1139–40; *see also Smith*, 659 P.2d at 1267 ("When interpreting an agreement, the court may always consider the surrounding circumstances." (citing Restatement (Second) of Contracts § 212 (1981))). If extrinsic evidence shows the parties used language in their contract they mutually understood and intended to have a certain meaning, the court must give effect to that intent, even if the words have a different meaning under ordinary usage. *See Taylor*, 854 P.2d at 1139. "[T]he purpose is to produce the contract result the parties intended, not that which the judge intends. Some words are clear beyond dispute. Some may mean one thing to the judge but could have meant something else to the parties. It is the latter meaning that is important." *Id.* at 1141 n.2.

Because the proceedings in the district court did not concentrate on the breach of contract claims, the parties had no reason to develop the record with all the facts relevant to those claims. Pure Wafer has consistently maintained that the parties extensively negotiated before executing the Agreement. It alleged that they met "on many occasions and communicated . . . by telephone and written communications." It also alleged they "spent several months negotiating the terms of [their Agreement] to provide the protection desired both to Pure Wafer and to the City, on the key economic development elements of their deal." According to Pure Wafer, "effluent capacity and quality were material terms the parties considered and negotiated . . . , and [the Agreement] reflects those bargains." It alleged the parties

negotiated for the City to accept effluent of a specific "chemical profile," and to accept the risk that the City's permit requirements could change, resulting in extra expense.

In describing the parties' negotiations, the district court cited only one exhibit and seven pages of trial transcript, coming from the testimony of only one witness. And even these two items were considered by the district court only for their relevance to the constitutional claims. The court did not address how this evidence may have pertained to the breach of contract allegations, because it found those claims to be moot. Arizona law allows a party to offer—and requires the court to consider—all extrinsic evidence that supports the party's reasonable interpretation of a contract. Given Pure Wafer's continued insistence that the parties extensively negotiated the terms at issue in this case prior to executing the Agreement, it is most likely that more extensive and compelling evidence exists than the current record shows.

For example, there is no evidence in the record to establish the City's intended meaning of the Agreement and understandings from the negotiations at the time of contract formation. Surely someone from the City involved in (or knowledgeable on the details of) the many months of "telephone and written communications" between the parties would be available to provide this information. Concerning negotiations, there may be several witnesses who can testify, early drafts of the Agreement, the parties' notes on those drafts, communications regarding their understandings of certain terms, compromises they reached, terms they changed, etc., *all of which* is highly relevant and necessary to determining the parties' intent, *but none of which* can be found in the record. The record indicates such evidence exists; it simply has not been made part of the record. For

example, a 1997 internal Pure Wafer memo refers to discussions of sewer usage rates the parties had at "the Development Agreement meeting." However, the record contains no minutes, notes, or correspondence to show specifically what was discussed at this meeting. Similarly, a 2011 letter from Pure Wafer to the City outlined that, in preparing the letter, Pure Wafer's attorney "pulled [Pure Wafer's] file from the time the Agreement was drafted and reviewed the notes of [his] meetings and telephone conversations with the City, as well as correspondence with the City and drafts of the Agreement." Yet these notes, written correspondence, and draft Agreements are absent from the record. Given this record, the testimony of a single witness (testifying on Pure Wafer's behalf) does not seem sufficient to establish the contractual intent of both parties at the time they executed the Agreement, especially where so much additional extrinsic evidence is likely available.

The parties' true intent cannot be revealed without consideration of all available evidence and application of that evidence to the language of the contract as a whole. Though it is certainly within the fact-finder's discretion, I anticipate the district court on remand would want to conduct additional proceedings with respect to the breach claims, because the lack of attention to those claims leaves the record far short of containing all available evidence of contractual intent. The parties should be permitted to develop concrete evidence of their positions and understandings of the relevant terms at the time they executed the Agreement.

## III.    Conclusion

The district court should have the first opportunity to consider whether to exercise supplemental jurisdiction,

because we have dismissed the only federal claim. This dismissal also necessitates a remand for the district court to make findings of fact and conclusions of law specific to the breach of contract claims, having previously found those claims to be moot. The majority errs by stepping into the role of fact-finder in the first instance with respect to the breach claims; by failing to address the claims Pure Wafer actually alleged; and by failing to recognize that its analysis of the breach claims contradicts the Agreement's plain meaning, fails to consider the Agreement as a whole, and is lacking adequate support from the record.

The circumstances warrant remand to permit the district court (or an Arizona court) the first opportunity to address the merits. Doing so would allow the trial court to focus on the language of the Agreement and, in accordance with Arizona law, consider any extrinsic evidence that supports a reasonably susceptible interpretation of the contract. While I am cognizant of the desire for a speedy and efficient resolution of this dispute, the majority's opinion sacrifices a proper and thorough resolution of this case for a speedy one.